1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   JOSE MONTEVERDE,                    )   No. C 09-0407 JW (PR)
                                         )
12            Petitioner,                )   ORDER DENYING PETITION FOR
                                         )   WRIT OF HABEAS CORPUS;
13      vs.                              )   DENYING CERTIFICATE OF
                                         )   APPEALABILITY
14                                       )
     SHEILA MITCHELL, Warden,            )
15                                       )
              Respondent.                )
16                                       )
                                         )
17   _____    )

18          Petitioner, a probationer, has filed a pro se petition for a writ of habeas corpus

19   pursuant to 28 U.S.C. § 2254, challenging his state convictions.  The court reviewed the

20   petition and ordered respondent to show cause why a writ of habeas corpus should not be

21   granted based on petitioner's cognizable claims.  Respondent filed an answer and

22   supplemental answer with a supporting memorandum and exhibits.

23

24                              **BACKGROUND**

25          In December 2006, petitioner was convicted by a Santa Clara County jury of theft of

26   an elder adult by a person not a caretaker (California Penal Code § 368(d)) and three counts

27   of forgery by check (California Penal Code  § 470(d)).  The trial court placed petitioner on

28   three years probation, with a six month jail term.    Petitioner's conviction was affirmed by

*United States District Court*
For the Northern District of California

1  the California Court of Appeal in an unpublished opinion.  <u>People v. Monteverde</u>, No.

2  H031351, Court of Appeal of the State of California, Sixth Appellate District, August 28,

3  2008 (filed by respondent as Exhibit 8 and hereinafter "Opinion").

4        The California Court of Appeal set forth the following relevant summary of facts:

5        The essence of the prosecution was proving that defendant, with
   intent to defraud, had either made three checks out to himself in

6  Margaret Gorlock's name or had uttered the three checks knowing of
   their falsity.  The three checks were number 558 for $400.00, dated

7  March 5, 2004 (count 2), number 674 for $400.00, dated June 30, 2005
   (count 3), and number 692 for $300.00, dated July 21, 2004 (count 4).

8  The essence of the prosecution evidence at trial was the testimony by
   Margaret, born in 1921, that she had not authorized defendant to sign

9  her name on her checks, and the expert testimony by John Bourke, a
   criminalist with the Santa Clara County Crime Laboratory, that

10 Margaret was not the person who had signed her name to these three
   checks.  At trial there was additional evidence about defendant and

11 Margaret and their relationship and additional expert testimony about
   these checks and others.

12 **A.**  ***The Relationship Between Defendant and Margaret***

13

14       At trial in 2006, Margaret admitted, "Mentally I'm not so good.
   My mind is not the same as it was.  I've lost it."  She remembered

15 defendant as someone who used to work with her and take care of her,
   but she could not remember how long she had known him.  He drove her

16 places.  They went out to eat.  She paid for the meals.  She could not
   remember him accompanying her to Las Vegas, despite photographic

17 evidence that he had.  She did not remember paying him.

18       According to Margaret's son Gregory, after her husband died in
   1999, she sold her house in Hollister and moved to Palo Alto to be

19 closer to her sons.  Due to her failing vision, in 2002 her sons talked her
   into giving up her driver's license, saying they would hire someone to

20 give her rides.  Near the end of 2002, she had a serious fall, so they
   moved her to the Sharon Heights Convalescent Center for a few months,

21 which is where she met defendant, who was a nurse-caregiver there.

22       Gregory was added to her checking account when she moved into
   the Center.  Records from the Bank of America, as summarized by

23 Heather Prescott, a paralegal with the district attorney's office, showed
   Gregory signing a check to "Sharon Heights Care" in June 2003.

24 Sometime in 2003, Margaret moved from the Center to Palo Alto
   Commons, an assisted living facility.

25       Margaret enjoyed going out to lunch and dinner, having a glass of
   wine or a nightcap, and playing quarter poker slot machines in Las

26 Vegas every month or two.  Her sons Gregory and William hired a
   group called Seniors at Home to drive her around to appointments and to

27 lunch.  Gregory believed that Margaret had hired defendant in the same
   capacity, but William testified that he had hired defendant, because his

28 mother liked him and defendant said he would help her after she left the

United States District Court

For the Northern District of California

convalescent center.  Defendant was paid $25 a day to take her to dinner.  Gregory said she appeared to trust him.

According to Gregory, Margaret liked to pay cash for her lunches and dinners.  When he reviewed the bank statements, he became concerned about how frequently she was withdrawing $500 amounts from an ATM.  According to bank records, from June 23 through July 1, 2003, she made four withdrawals totaling $1,500.00.  From August 4 through 28, 2003, she made 11 withdrawals totaling $5,001.50.  Altogether, between May 21 and November 25, 2003, there were 82 ATM withdrawals, mostly of $500, totaling $26,529.00.[1]

When Gregory questioned Margaret, she said she had not given her ATM card to anyone.  She initially denied spending that much, but after she saw the bank statement, she said she would cut back.  She never claimed that she had not made the withdrawals. [FN omitted].

Gregory contacted the bank to see if they could provide him a video of who was using her ATM card.  The bank told him he would need to go through the police.  He contacted the Palo Alto Police Department and learned that it would be too difficult to obtain or monitor the ATM videos.

Gregory did not pay for Margaret's trips to Las Vegas.  He assumed that some of the cash she withdrew was for those trips.  William testified, "I used to give her about $3,000 every time she went to Vegas" in cash.

On November 19, 2003, William's name was added to her account.  He and his office staff took over management of her account because she was going through a lot of money, and he had more time than Gregory did.  William took away her ATM card in November 2003.  William paid defendant by check and in cash.

In 2004, William questioned some of the signatures on his mother's checks and brought them to the Palo Alto Police Department.

Defendant did not testify at trial, but he did prepare a typed document dated November 28, 2005, addressed to the "HONORABLE JUDGE" in his case, that was admitted into evidence.  The document contained his explanation of 38 checks payable to him.  He said he worked for Margaret as a driver.  "Ms. Garlock didn't pay me like a caregiver, nor was I her caregiver."  She paid him $25.00 per day to take her to restaurants, travel, shopping and appointments.  Twenty-eight of the checks represented his salary.  The rest correlated with three trips to Las Vegas, on October 27, 200, March 25, 2004, and June 16, 2004.

According to this document, check 558 for $400.00, dated March 5, 2004, was part of his salary for December 2003.  Check 681 for $300.00, dated July 21, 2004, was another part of his salary for December 2003.  Check 674 for $400.00, dated June 30, 2004, was

---

[1][Opinion Footnote 4] In examining Gregory, the prosecutor incorrectly asserted that the total was about $40,000.

1    partial reimbursement for the Las Vegas trip on March 25, 2004. [FN
2    omitted.].  Defendant wrote that, while he encouraged Margaret to pay
     on time, her payments were usually late.

3         On March 8, 2006, defendant, his stepdaughter, and his attorney
4    at the time, Mike Paez, attended a meeting with Heather Prescott,
     Deputy District Attorney Tiyen Lin, and a Spanish interpreter.
     Defendant described Margaret as a woman of 75 to 80 years old.  He
5    said she paid him by cash and check.  She paid for their meals, usually
     in cash.  He said he saw her sign every check and that he did not sign
6    any check.

7         A travel agent, Helen Almada, testified for the defense that
8    defendant booked three trips to Las Vegas for himself and Margaret.  On
     each occasion, he gave the agent cash, and she used her own credit card
     to purchase the tickets and rooms.
9

10   **B.**     ***The Expert's Testimony***

11        Regarding the three checks in issue, numbers 558, 674, and 691,
     all depicted in 13 x 19 enlargements, Bourke [handwriting expert for the
     prosecution] testified as follows.  The payee name "JOSE
12   MONTEVERDE" on each check was written in defendant's hand.

13        Check number 558 was probably not signed by Margaret.  The
14   first "r" in "Margaret" showed better writing skills than evidence in
     known samples of Margaret's handwriting.  Also, it looks like the writer
     stopped and started between the "r" and the "g."
15

16        Check number 674 was probably not signed by Margaret.  The
     "k" in "Garlock" had an added stroke that did not appear in her
17   signatures.  The amount of the check was written as "tree hundred."  No
     known writing samples of Margaret misspelled "three" while several
     known writing samples by defendant misspelled "three" in this way.
18

19        Check number 691 was a simulation.  A simulation is when one
     person tries to duplicate another's signature.  Evidence supporting that
20   conclusion was that the first "r" in "Margaret" was double-looped,
     unlike in any of her known signatures.  Again, the "k" in "Garlock" had
     an added stroke that did not appear in her signatures.
21

22        Between October 8, 2003 and July 21, 2004, there were 56
     checks totaling $12,544.00 to defendant with the signature of "Margaret
23   L. Garlock."  Bourke examined 36 of these checks and prepared a
     written report concluding that she probably did not sign 21 of them.  At
24   trial he explained why he concluded that seven other checks (numbered
     558, 658, 661, 664, 668, 672, and 685) were probably not written by
     her.[2]  For example, number 685 contained the same misspelling of
25

26   ────────────────
     [2] [Opinion Footnote 7] Bourke gave specific reasons in his testimony for why he believed that
27   Margaret probably did not write ten of the checks, including the three checks in issue.  Although he
     stated that there were another 11 that she probably did not write, he did not elaborate on why he
28   reached that conclusion as to those checks or what his opinions were about the other 15 checks he
     examined.  These opinions were stated in his seven-page typed report, which was in evidence.

1   "three" as number 674.  Numbers 658 and 672 spelled "forty" as
    "fourty." It was misspelled the same way in known samples of
2   defendant's handwriting, but not Margaret's.

3       Nancy Cole, a questioned documents examiner, testified for the
    defense as follows.  On the questioned checks, defendant wrote his own
4   name, and sometimes wrote the numerical amount, and sometimes even
    spelled out the number.  But it is highly probable that Margaret signed
5   all the checks.  The variations and irregularities in her signatures are
    explained by her age, her failing eyesight, her tremor, fatigue and, her
6   medications and drinking wine.  The final "k" in her name is sometimes
    distorted, as on check numbers 666, 674, and 691, because people get
7   tired of their signatures by the end of their names.  There are variations
    in her "r's", as on check number 558.  If the signatures were
8   simulations, there would be more evidence of starting and stopping in
    the middle of the signature.  People sometimes correct their own
9   signatures.

10      It appeared to Cole to be Margaret's style of writing on numbers
    558, 674, and 691.  It was at least highly probable that she signed those
11  checks and also wrote and spelled out the payment amounts.  It is
    conceivable she would misspell "three" based on what was affecting
12  her.

13  Opinion at 2-7.

14

15                          **DISCUSSION**

16  A.    Standard of Review

17      This court may entertain a petition for a writ of habeas corpus "in behalf of a person in

18  custody pursuant to the judgment of a State court only on the ground that he is in custody in

19  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

20      The writ may not be granted with respect to any claim that was adjudicated on the

21  merits in state court unless the state court's adjudication of the claim: "(1) resulted in a

22  decision that was contrary to, or involved an unreasonable application of, clearly established

23  Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a

24  decision that was based on an unreasonable determination of the facts in light of the evidence

25  presented in the State court proceeding."  Id. § 2254(d).

26      "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

27  court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

28  law or if the state court decides a case differently than [the] Court has on a set of materially

United States District Court

For the Northern District of California

indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." <u>Id.</u> at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. <u>Williams</u>, 529 U.S. at 412; <u>Clark v. Murphy</u>, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. <u>Id.</u>

Even if the state court decision was either contrary to or an unreasonable application of clearly established federal law, within the meaning of AEDPA, habeas relief is still only warranted if the constitutional error at issue had a "'substantial and injurious effect or influence in determining the jury's verdict.'" <u>Penry v. Johnson</u>, 532 U.S. 782, 796 (2001) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993)).

Lastly, a federal habeas court may grant the writ it if concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. <u>Id.</u> at §2254(e)(1).

6

1

2   B.      Legal Claims and Analysis

3           Petitioner raises four primary claims for federal habeas relief: (1) the prosecutor

4   argued two alternative theories of forgery, one of which was legally erroneous, in violation of

5   petitioner's due process rights; (2) petitioner was convicted of theft from an elder under the

6   wrong subdivision of California Penal Code § 368; (3) evidence of ATM withdrawals was

7   improperly admitted at trial; and (4) petitioner received ineffective assistance of counsel.

8   Each claim will be considered in turn.

9

10          1.      Theories of Forgery

11          Petitioner claims that his due process rights were violated because the prosecutor

12  argued two alternative theories of forgery, one of which petitioner maintains was legally

13  erroneous.  The state court considered this claim in a reasoned opinion on direct appeal.

14          The instructions and the prosecutor's arguments reflect the two methods
    of forgery identified in *People v. Luizzi* (1960) 186 Cal. App. 2d 639 at page
15      644.  "The crime of forgery as denounced by statutes (Pen. Code, § 470)
    consists of either of two distinct acts – the fraudulent making of an instrument,
16      such as a false writing thereof, or the uttering of a spurious instrument by
    passing the same as genuine with knowledge of its falsity (*People v. Lucas*
17      [(1924)] 67 Cal. App. 452 . . .); and although both acts may be alleged in the
    conjunctive in the same count of the language of the statute, the offense does
18      not require the commission of both – it is complete when one either falsely
    makes a document without authority or passes such a document with intent to
19      defraud (*People v. Pounds* [(1959)] 168 Cal. App. 2d 756 . . . [citations
    omitted]) and the performance of one or both of these acts with reference to the
20      same instrument constitutes but a single offense of forgery. [citation omitted.]

21          Defendant argues that prosecutor relied on the legally erroneous theory
    that defendant "made a false check by signing someone else's name . . . ."
22      (Emphasis in original.)  According to defendant, "signing someone else's name
    on an instrument does not constitute 'making a check.'" Defendant essentially
23      reasons that section 470, subdivision (d) does not prohibit a false signature on a
    check, because that is prohibited by section 470, subdivision (a).

24          This argument arises from a 1998 revision of section 470.  Prior to this
25      revision of section 470, subdivision (a) prohibited signing another person's
    name to a check knowing he has no authority to do so, falsely making or
26      forging a check, and uttering, publishing, or passing as genuine a check he
    knows to be false or forged. . . .  It was established under the former statute that
27      forging and uttering are two different legal theories on which a jury need not
    agree to convict a defendant of forgery (*People v. Sutherland* (1993) 17 Cal.
28      App. 4th 602, 618), as the jury was here instructed.

United States District Court
For the Northern District of California

1

2

3

4

5
    As amended, subdivision (a) of section 470 now provides: "Every person who, with the intent to defraud, knowing that he or she has no authority to do so, signs the name of another person or of a fictitious person to any of the items listed in subdivision (d) is guilty of forgery." Subdivision (d) now describes a number of methods of forgery, "Every person who, with the intent to defraud, falsely makes, alters, forges, or counterfeits, utters, publishes, passes or attempts or offers to pass, as true and genuine, any of the following items, knowing the same to be false, altered, forged or counterfeited, is guilty of forgery: "any check" or over 30 other kinds of documents.

6
    . . . .

7

8

9

10

11
    We conclude that the prosecutor's opening argument and the instructions accurately presented two methods of violating subdivision (d). The jury was not given an erroneous legal theory of forgery. There was no error requiring an amendment of the information to conform to proof of a violation of subdivision (a) of section 470. (*People v. Ford* (1980) 110 Cal. App. 3d 986, 987 [parallel citation omitted] [defendant not prejudiced by amendment at conclusion of prosecution's case changing "'possession for sale'" to "'sale'" when it did not affect her defense] . . . .) Since there was no error, there was no structural error or deprivation of due process.

12
Opinion at 8-11.

13

14

15

16
    Petitioner cannot demonstrate that anything in the state court's reasoned opinion denying this claim is contrary to, or an unreasonable application of, clearly established United States Supreme Court law. Nor can he show that the opinion was based on an unreasonable determination of the facts.

17

18

19

20

21

22

23

24

25

26

27

28
    Petitioner is essentially arguing that the instructions given to the jury included an erroneous legal theory of forgery under California state law. The United States Supreme Court has confirmed that a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). Rather, to obtain federal collateral relief for instructional error, a petitioner must show that the ailing instruction or the lack of instruction by itself so infected the entire trial that the resulting conviction violates due process. Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (""[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72.

Here, petitioner cannot show that the trial court's alleged violation of state law states a federal constitutional claim.  To the extent he is alleging that the instructional error is a violation of federal due process law, his claim must fail as he can cite to no relevant case or statutory law supporting such an argument.  As the Ninth Circuit has stated, a petitioner "may not, . . . transform a state-law issue into a federal one merely by asserting a violation of due process."  <u>Langford v. Day</u>, 110 F.3d 1380, 1389 (9th Cir. 1996).

As the state court reasonably confirmed, "the prosecutor's opening argument and the instructions accurately presented two methods of violating subdivision (d).  The jury was not given an erroneous legal theory of forgery."  Opinion at 11.   In addition, even if petitioner had demonstrated a colorable claim of error, he would not be able to show that any error had a substantial or injurious effect on the verdict.  <u>Brecht</u>, 507 U.S. at 638.   Therefore, any alleged error does not rise to the level of a due process violation and petitioner's claim must be denied.

### 2.   Theft of an Elder

Petitioner maintains that he was convicted of theft from an elder under the wrong subdivision of section 368 of the California Penal Code.  The state court considered this claim in a reasoned opinion on direct appeal.

> Section 368, subdivision (d) provides a special punishment for the crimes of "theft, embezzlement, forgery or fraud" against an elder person (defined as 65 years or older) by a person "who is not a caretaker." Subdivision (e) provides the same punishment for the same crimes by "[a]ny caretaker of an elder or a dependent adult."  A violation of subdivision (d), but not (e), requires that the defendant knew or should have known the victim was 65 or older.  Subdivsion (i) provides: "As used in this section, 'caretaker' means any person who has the care, custody, or control of, or who stands in a position of trust with, an elder or a dependent adult."

> In this case, the jury was not instructed to decide whether defendant was or was not a caretaker.  It was asked to decide if there was a theft or property worth over $400 from a person that defendant reasonably should have known was 65 or older.  As already noted, defense counsel approved the form and content of the instructions.

> Until a 1998 revision, this statute protected the elderly against theft or embezzlement only by a caretaker. . . . The scope of protection against these crimes was expanded by 1998 legislation to reach perpetrators who are not

United States District Court

For the Northern District of California

caretakers. . . .  We take judicial notice that the intent of this legislation was to "target criminals who victimize elders by means of fraud" even though they do not fit the statutory definition of "caretaker." [citation omitted].

It is clear both from the amendment of section 368 and the legislative history that this change expanded the statute's scope to eliminate the element that the perpetrator must be a caretaker.  The amendment was not intended to create a caretaker defense and shelter from criminal liability thieving and embezzling caretakers.  We understand the amendment, though awkwardly phrased, as relieving prosecutors from having to prove that the perpetrator was a caretaker, so long as the prosecutor proves instead that the perpetrator should have known the victim was elderly.  This amendment, which expanded the scope of protection by replacing one element (caretaker status) with another (reasonable knowledge that the victim is elderly), was not intended to inhibit prosecution by adding another element (the perpetrator's non-caretaker status) to the prosecutor's burden of proof.  The enactment of subdivision (d) simply gives prosecutors an option of prosecuting someone whose caretaker status is in doubt.  We are obliged to avoid a construction giving this amendment an unintended and silly consequence.  (*People v. Mendoza* (2000) 23 Cal. 4th 896, 908, 911.)  We conclude that "A person who is not a caretaker" really means "a person, whether or not a caretaker."  We are not reading this phrase out of the statute, although we invite the Legislature to do so.

. . . .

In this case, defendant was on notice from the time the complaint was filed on August 18, 2005, that he was charged with "theft or embezzlement of more than $400 by a person not a caretaker from an elder or dependent adult, in violation of Penal Code section 368(d)." . . . The original information filed July 6, 2006 contained the same charge.

On November 18, 2005, defendant wrote, "Ms. Garlock didn't pay me like a caregiver, nor was I her caregiver."  Now he argues "[t]he evidence at trial proved that the appellant was, in fact, a caretaker of Ms. Garlock" and that "[i]t is indisputable that appellant stood 'in a position of trust' with Ms. Garlock."  Defendant's own written statement raised some question about his status.  The evidence here was that defendant was hired to be Margaret's frequent dinner and traveling companion. He provided her with transportation. She paid for their meals.  He was not supposed to be managing her finances or signing her checks.  At the time the checks were forged, she was living in an assisted living facility.  While she seemed to trust him for a time, that did not necessarily establish beyond a reasonable doubt that he was entrusted with her care, custody, and control.

We conclude that the prosecutor was not required to prosecute defendant for violating subdivision (e) of section 368.  The jury was properly instructed that defendant was charged with violating subdivision (d), not subdivision (e).  The instructions did not omit an element of the crime described in subdivision (d).  Since the prosecutor was not required to prove the nonexistence of a caretaker relationship, there was no failure of proof of an element of that crime.  There was no need to amend the information after trial to confirm to proof that defendant violated subdivision(e), not subdivision (d).

Opinion at 12-14.

United States District Court
For the Northern District of California

Petitioner cannot demonstrate that anything in the state court's reasoned opinion denying these claims is contrary to, or an unreasonable application of, clearly established United States Supreme Court law.  Nor can he show that the opinion was based on an unreasonable determination of the facts.

In petitioner's case, the California Court of Appeal was engaged in an analysis and interpretation of California state law.  A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Hicks v. Feiock, 485 U.S 624, 629 (1988).

The state's highest court is the final authority on the law of that state.  Sandstrom v. Montana, 442 U.S. 510, 516-517 (1979).  Even a determination of state law made by an intermediate appellate court must be followed and may not be "'disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'"  Hicks, 485 U.S. at 630 n. 3 (quoting West v. American Telephone & Telegraph Co., 311 U.S. 223, 237-38 (1940)).  A federal court may, however, re-examine a state court's interpretation of its law if that interpretation appears to be an obvious subterfuge to evade consideration of a federal issue.  Mullaney v. Wilbur, 421 U.S. 684, 691 n. 11 (1975).

Petitioner does not and cannot cite to any evidence either that the California Supreme Court would decide this matter differently or that the California Court of Appeal's decision was a subterfuge to evade consideration of a federal issue.  The California Supreme Court denied petitioner's petition for review from the decision on direct appeal and also denied petitioner's habeas petition.  Had the California Supreme Court wanted to overturn the California Court of Appeal's analysis of the state law at issue, presumably it could have done so, either on direct or collateral review of petitioner's case.  There is also no evidence (nor does petitioner even assert) that the state court was engaged in an obvious subterfuge to avoid consideration of a federal issue.  Mullaney, 421 U.S. at 691.  Accordingly, petitioner's claim that the state court interpretation of the section was in error must be denied.

To the extent petitioner is arguing that the jury was not properly instructed regarding

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  section 368, that claim must also be denied.  As discussed *supra*, to obtain federal collateral

2  relief for instructional error, a petitioner must show that the ailing instruction or the lack of

3  instruction by itself so infected the entire trial that the resulting conviction violates due

4  process.  Estelle, 502 U.S. at 72.  The state court found that the jury was properly instructed

5  (Opinion at 14), and petitioner can cite to no relevant case or statutory law supporting the

6  argument that any alleged instructional error violated due process.  In addition, petitioner

7  cannot show that any error had a substantial or injurious effect on the verdict.  Brecht, 507

8  U.S. at 638.   Therefore, petitioner's claims regarding this issue must be denied.

9

10          3.       ATM Withdrawals

11          Petitioner maintains that evidence of ATM withdrawals was improperly admitted at

12  trial, resulting in prejudice to him.  The state court considered this claim in a reasoned

13  opinion on direct appeal.

14          The state court first reviewed the record regarding the trial court's decision to allow

15  the admission of the evidence of the ATM withdrawals.  The prosecutor requested admission

16  of bank records showing, in addition to the checks at issue in the charged crimes, about

17  $12,000 in ATM withdrawals; petitioner was not charged with any crimes relating to those

18  withdrawals.  Opinion at 14-15.  Petitioner filed a motion *in limine* seeking to preclude

19  evidence of the withdrawals, arguing that they were more prejudicial that probative.  The

20  court denied petitioner's motion.  The prosecutor stated on the record that he would argue to

21  the jury that the charges were based on the checks; defense counsel later stated he was

22  "satisfied" with that outcome.  Opinion at 15.  The state court continued:

23          True to his word, the prosecutor did not mention the ATM withdrawals
        in opening or closing jury argument.  Instead, he asserted in opening argument
24      that the forgery charges, counts 2, 3, and 4, were based on check numbers 558,
        674, and 691, respectively.  "If Margaret did not give permission to Jose
25      Monteverde to sign those checks, and Jose Monteverde did sign those checks in
        her name, then all of those charges, Counts 1, 2, 3, and 4 really fall into place. .
26      . ."

27          Defense counsel emphasized to the jury, "in this case Mr. Monteverde is
        accused of forging checks.  He's not accused of stealing money out of her
28      purse.  He's not accused of flimflamming Mrs. Garlock into giving him money.

He's not accused of taking funds from her in all the imaginable ways that one could take funds from somebody." Nevertheless, defense counsel spent some time talking about the ATM withdrawals. He said he was initially concerned about all the ATM withdrawals in 2003. But it appeared that Margaret was a woman with expensive habits, like going out to eat and traveling to Las Vegas, and she liked to pay in cash. Ultimately, defense counsel concluded that while he tried to offer an explanation of the withdrawals, he did not "really have to because the bottom line here is Mr. Monteverde is not accused of taking the money or finagling her out of money or whatever, or getting her to give him money or whatever. He is accused of forging her checks. And if you don't believe he forged her checks, he's not guilty period."

The only reference that the prosecutor made to Margaret's habit of spending cash was in response to an argument about defendant's written statement. Defense counsel said that the statement provided "some explanation of what the checks are for." "He accounted in this way for or tried to account in this way for all the checks that in his mind were suspect," the checks he was accused of forging. The jury should not speculate about why defendant did not account for the other checks written to him. Counsel questioned whether William really gave his mother $3,000 cash every time she went to Las Vegas. It is possible that she kept some of the cash, which is why the ATM withdrawals decreased.

Part of the prosecutor's closing argument follows. The jury should look carefully at defendant's written statement. Defendant claimed to have been reimbursed for an October 27, 2003 trip to Las Vegas by checks written on October 8, 2003, May 4, 2004, and June 26, 2004. [footnote omitted]. Did that make sense considering that they took other trips during that period for which defendant claimed to have been reimbursed? It looked like someone "who is looking back and trying to justify why he's received money." Regarding the trips, "the defense witness came in and said, yeah, she received payment for these trips, and the trips were always paid for by her company with a credit card after she received cash. Who of all the persons mentioned in this trial likes to use cash, and remember, Bill Garlock for every Las Vegas trip he gave his mom $3,000. Who would have the cash to pay for these kind [*sic*] trip in cash?" According to defendant, the checks were written in random order.

Elaborating on this last point, the Attorney General asserts that the evidence of the ATM withdrawals was properly admitted as relevant, because it tended to refute defendant's written statement that several checks were written to reimburse him for paying for three Las Vegas trips. As Margaret liked to pay cash and seemed to keep plenty of cash on hand to pay her bills, it is more likely that the cash defendant used to pay for the Las Vegas trips came from her, rather than from him.

Defendant points out that this was not the prosecutor's stated reasons for introducing the evidence. We agree. While the prosecutor did assert that the ATM withdrawals showed that she had enough money to cover her expenses, he did not connect this general assertion with the expenses of the Las Vegas trips. Moreover, William testified that he provided the $3,000 cash for each of her trips.

However, as the Supreme Court reiterated in *People v. Brown* (2004) 33 Cal. 4th 892, "If a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a

United States District Court

For the Northern District of California

mistaken theory, or one not raised below." (*Id.* at p. 901.)  The novelty of this relevance argument is no reason to reject it.

Defendant argues further that there was no evidentiary basis for assuming that the cash he paid to the travel agent came from Margaret.  This overlooks that both William and defendant stated that defendant was sometimes paid in cash.  It is not unreasonable speculation but a reasonable inference that, if Margaret received cash from William and ATM withdrawals, she liked to pay cash, she liked to travel to Las Vegas, and defendant paid cash for three trips to Las Vegas, that the cash came from Margaret.  We conclude that the evidence was properly admitted because it tended to refute defendant's reimbursement explanation for 10 checks.

As to defendant's implicit argument that this evidence prejudiced him by giving rise to an inference that defendant was responsible for the excessive ATM withdrawals, we conclude that this potential danger was not realized in this case.  The prosecutor did not argue that the ATM withdrawals proved anything or that defendant was responsible for them, even in response to defendant's argument that they were irrelevant.  Gregory testified that his mother, when confronted about excessive withdrawals, never denied being responsible for them (except as to one disputed withdrawal at the very beginning of the relevant time period).  Defense counsel effectively argued that the ATM withdrawals were irrelevant to the question of whether defendant forged or uttered the three checks in issue.  The prosecutor's argument was focused on the forgery of the three checks.

In any event, in view of the evidence and jury arguments, we see no indication that defendant was prejudiced by the evidence of ATM withdrawals even if we assume that it should have been excluded under the general rule that the financial condition of the victim in a forgery case is inadmissible.  (*People v. Lapique* (1902) 136 Cal. 503, 506.)  Given the lack of evidence that defendant caused the ATM withdrawals, the only way the jury could have inferred his responsibility was to first find him guilty of the charged crimes.  We conclude there was no reasonable probability that the ATM evidence affected the jury's verdict.  As this evidence did not tend to prove defendant's criminal liability, its admission did not rise to the level of a violation of the federal constitution.  (Cf. *People v. Chatman* (2006) 38 Cal. 4th 344, 370-371.)

Opinion at 15-18.

Petitioner cannot demonstrate that anything in the state court's reasoned opinion denying these claims is contrary to, or an unreasonable application of, clearly established United States Supreme Court law.  Nor can he show that the opinion was based on an unreasonable determination of the facts.

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  See Henry v. Kernan, 197 F.3d

United States District Court

For the Northern District of California

1021, 1031 (9th Cir. 1999); <u>Colley v. Sumner</u>, 784 F.2d 984, 990 (9th Cir.), <u>cert. denied</u>, 479 U.S. 839 (1986).  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  <u>See</u> <u>Walters v. Maass</u>, 45 F. 3d 1355, 1357 (9th Cir. 1995).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  <u>See</u> <u>Jammal v. Van de Kamp</u>, 926 F. 2d 918, 920 (9th Cir. 1991).

Here, as the state court reasonably decided and as this court's review of the record confirms, there was no error in admission of the evidence of ATM withdrawals because the withdrawals were arguably relevant "to refute defendant's reimbursement explanation for 10 checks."  Opinion at 17.  Furthermore, the evidence was not unduly prejudicial.  It was not admitted to demonstrate petitioner's guilt for the charged crimes, nor did it, as petitioner alleges, give rise to an inference that petitioner was responsible for withdrawing the money.  The prosecutor did not so argue, Opinion at 18, and petitioner can point to nothing in the record that indicated evidence of the ATM withdrawals was prejudicial.  As such, admission of the testimony did not violate due process.

Moreover, in order to obtain habeas relief on the basis of an evidentiary error, a petitioner must show that the error was one of constitutional dimension and that it was not harmless under <u>Brecht</u>.  Here, for the reasons discussed *supra*, petitioner cannot show that the trial court's alleged error had "'a substantial and injurious effect' on the verdict.'"  <u>Dillard v. Roe</u>, 244 F. 3d 758, 767 n.7 (9th Cir. 2001) (quoting <u>Brecht</u>, 507 U.S. at 623).  Because petitioner cannot demonstrate prejudice, his claim must be denied.

4.     <u>Ineffective Assistance of Counsel</u>

Petitioner maintains that his trial counsel provided ineffective assistance in violation of the Sixth Amendment.  Petitioner makes four claims of ineffective assistance: 1) counsel's provision of statements to the prosecutor; 2) counsel's failure to request an instruction regarding the ATM withdrawals; 3) counsel's failure to object to alleged prosecutorial misconduct; and 4) counsel's failure to retain an expert witness.  Each claim will be

1  considered.[3]

2

3            a.      Standard of Review

4        The Sixth Amendment guarantees the right to effective assistance of counsel.

5  Strickland v. Washington, 466 U.S. 668, 686 (1984).  To prevail on a claim of ineffective

6  assistance of counsel, petitioner must show that counsel's performance was deficient and that

7  the deficient performance prejudiced petitioner's defense.  Id. at 688.  To prove deficient

8  performance, petitioner must demonstrate that counsel's representation fell below an

9  objective standard of reasonableness under prevailing professional norms.  Id.  To prove

10 counsel's performance was prejudicial, petitioner must demonstrate a "reasonable probability

11 that, but for counsel's unprofessional errors, the result of the proceeding would have been

12 different.  A reasonable probability is a probability sufficient to undermine confidence in the

13 outcome."  Id. at 694.

14       A court need not determine whether counsel's performance was deficient before

15 examining the prejudice suffered by the defendant as the result of the alleged deficiencies.

16 See Strickland, 466 U.S. at 697; Williams v. Calderon, 52 F. 3d 1465, 1470 & n.3 (9th Cir.

17 1995) (approving district court's refusal to consider whether counsel's conduct was deficient

18 after determining that petitioner could not establish prejudice), cert. denied, 516 U.S. 1124

19 (1996).

20       A petitioner can make out a claim of ineffective assistance of counsel only by pointing

21 to specific errors made by trial counsel.  See United States v. Cronic, 466 U.S. 648, 646

22 (1984); Ortiz v. Stewart, 149 F.3d 923, 933 (9th Cir. 1998) (inexperience alone does not

23 establish ineffectiveness); Smith v Ylst, 826 F.2d 872, 875 (9th Cir. 1987); United States v

24 Mouzin, 785 F.2d 682, 696-700 (9th Cir. 1986) (disbarment without more does not render

25 services of counsel ineffective).  Counsel's conduct must be evaluated for purposes of the

26 performance standard of Strickland "as of the time of counsel's conduct."  Lowry v. Lewis,

27

28       [3] The California Court of Appeals disposed of petitioner's ineffective assistance of counsel
   claims in a summary decision.  Opinion at 2.

21 F.3d 344, 346 (9th Cir. 1994) (citations omitted).

A difference of opinion as to trial tactics does not constitute denial of effective assistance, United States v. Mayo, 646 F2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available.  Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir. 1984); United States v. Ferreira-Alameda, 815 F2d 1251 (9th Cir. 1987).  Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances.  Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).

Petitioner has the burden of showing that counsel's performance was deficient. Toomey v. Bunnell, 898 F.2d 741, 743 (9th Cir. 1990).  Similarly, he must "affirmatively prove prejudice."  Strickland, 466 U.S. at 693.  Conclusory allegations that counsel was ineffective do not warrant relief.  Jones v. Gomez, 66 F3.d 199, 205 (9th Cir. 1995).

b.    Provision of Statement to Prosecutor

Petitioner contends that it was ineffective assistance for his counsel to provide to the prosecutor petitioner's written statement.   The statement was in the form of a letter, and contains petitioner's alleged justifications for payments received from Margaret. Specifically, the document contains petitioner's explanations of services provided to Margaret and expenditures made on her behalf.  If also correlates the services and expenditures to specific check numbers.  It was introduced by the prosecutor as a trial exhibit.

Petitioner has submitted a declaration from Michael Paez, petitioner's counsel through the preliminary hearing of petitioner's prosecution, where he addresses the production of this statement to the prosecutor.  Petitioner's Exhibit 3 (hereinafter "Paez Decl.").  Paez states that he produced petitioner's statement to the prosecutor because he believed it to be:

exculpatory and consistent with what the petitioner's anticipated trial testimony would be; and that the petitioner's level of cooperation would lead to a reduction of the charges.  In fact, [the prosecutor] did offer to reduce the

1    charges to one misdemeanor count of grand theft, with twenty to thirty days of
2    weekend work detail and no jail time.  I think this offer was a direct result of
     the production of [petitioner's statement].

3    Paez Decl. at ¶ 7.  Paez also states that petitioner, who insisted he was innocent and wanted

4    to testify at trial,[4]  wanted the statement turned over to the prosecutor, approved its

5    production, and was present when it was turned over to the prosecution.  Paez Decl. at ¶¶ 8-9.

6        Petitioner now claims that his trial counsel ought to have known the statement was

7    potentially damaging to his defense and should not have produced it to the prosecutor.

8    Petitioner cannot demonstrate, however, that Paez's tactical decision to produce the

9    document constituted deficient performance.

10        Here, Paez's decision to produce petitioner's statement, which was made at

11    petitioner's request and with his consent, was based an informed decision based on strategic

12    considerations, and appears reasonable under the circumstances.  See Sanders, 21 F.3d at

13    1456.  Paez stated that he believed the exhibit was exculpatory and consistent with

14    petitioner's defense.  Paez Decl. at ¶ 7.  In addition, Paez declares (and petitioner can offer

15    no evidence to the contrary) that production of the statement likely led directly to an offer by

16    the prosecutor to reduce the charges.  Id.

17        In sum, petitioner cannot show that Paez's performance was deficient.  See Strickland,

18    466 U.S. at 687.  As such, this court need not address whether petitioner has demonstrated

19    prejudice.  See Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).  Nonetheless, this

20    court finds that even if petitioner had demonstrated deficient performance, he would not be

21    able to demonstrate that his counsel's actions were prejudicial to him.  Even though

22    petitioner did not testify, the statement was consistent with petitioner's defense at trial, which

23    was that the checks at issue were not signed by him but by Margaret, and were for services

24    rendered.  In addition, the statement offered an arguably legitimate explanation for the check

25    amounts and a description of petitioner's services.  Given the nature of the document,

26    petitioner cannot demonstrate that there is a reasonable probability that, but for counsel's

27

28

[4] Ultimately, petitioner did not testify at his trial.  Opinion at 4.

United States District Court
For the Northern District of California

1   production of the document, the result of the proceeding would have been different.

2   <u>Strickland</u>, 466 U.S. at 694.  This claim must therefore be denied.

3

4                    c.      Failure to Request Limiting Instruction

5          Petitioner also maintains that his counsel was ineffective when he did not request a

6   limiting instruction regarding evidence of ATM withdrawals.  The state court denied this

7   claim in a summary opinion.

8          Even if petitioner were able to show that his counsel's decision not to request a

9   limiting instruction was deficient performance, he would not be able to demonstrate

10  prejudice.  <u>See</u> <u>Strickland</u>, 466 U.S. at 697 (finding that a court need not determine whether

11  counsel's performance was deficient before examining the prejudice suffered by the

12  defendant as the result of the alleged deficiencies).   As discussed in detail *supra*, with

13  regards to petitioner's claim regarding the admission of evidence of the ATM withdrawals,

14  the California Court of Appeal decided that the evidence was properly admitted and was not

15  prejudicial to petitioner, Opinion at 17, a decision that this court found reasonable.  The

16  prosecutor did not maintain that petitioner was in any way responsible for the ATM

17  withdrawals, or guilty of any crime relating to them.   Accordingly, there is no reasonable

18  probability that, had petitioner's counsel requested limiting instructions, the result of his trial

19  would have been different.  <u>Strickland</u>, 466 U.S.  at 693-694.  Petitioner's claim must be

20  denied.

21

22                    d.      Failure to Object to Alleged Prosecutorial Misconduct

23         Petitioner also alleges that his counsel was ineffective when he failed to object to

24  alleged prosecutorial misconduct.  Petitioner maintains that the prosecutor misstated the

25  standard for reasonable doubt, and referred to statements made by Margaret that she had not

26  given permission to petitioner to sign her checks.  According to petitioner, these statements

27  were outside of the trial record.

28         Even if petitioner were able to show that his counsel's lack of objection was deficient

performance, he would not be able to demonstrate prejudice.  See Strickland, 466 U.S. at 697

(finding that a court need not determine whether counsel's performance was deficient before

examining the prejudice suffered by the defendant as the result of the alleged deficiencies).

To begin with, the jury at petitioner's trial was instructed by the trial judge that closing

argument was not evidence.  RT at 303.   See, e.g., United States v. Soulard, 730 F.2d 1292,

1307 (stating that judicial instructions confirming that closing argument is not evidence may

cure prejudice.)

       In addition, the prosecutor's statements did not rise to the level of prejudicial

misconduct.  "The appropriate standard of review for [a prosecutorial misconduct claim] on

writ of habeas corpus is the narrow one of due process, and not the broad exercise of

supervisory power."  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citations omitted).

Thus, the court must determine whether the prosecutor's conduct "'so infected the trial with

unfairness as to make the resulting conviction a denial of due process.'"  Id. (citing Donnelly

v. DeChristoforo, 416 U.S. 637 (1974).

       Here, the prosecutor's statements during closing argument do not rise to a due process

violation, and thus petitioner cannot demonstrate that the state court's summary rejection of

this claim was objectively unreasonable.  To the extent the prosecutor's comments at issue

were erroneous, they were corrected by the trial judge's instructions to the jury.  In addition,

there was substantial evidence in support of petitioner's guilt, and petitioner cannot cite to

any cases, nor to anything in the record, indicating that, had his counsel objected at closing

argument, the result of the proceeding would have different.  Because the prosecutor's

statements did not rise to the level of misconduct, it cannot be prejudicial for petitioner's

counsel to have failed to object to them.  Strickland, 466 U.S. at 693-694.  Accordingly, and

given that a reviewing court must indulge a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance, petitioner's claim must be

denied.  Id. at 688; Sanders, 21 F3d at 1456.

          e.       Failure to Retain an Expert

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1    Petitioner also alleges that his counsel rendered ineffective assistance when he failed

2  to investigate and call an expert witness regarding Alzheimer's disease.  According to

3  petitioner, such an expert could have supported a motion to exclude Margaret's testimony.

4    Petitioner has submitted a declaration from Dennis Smith, petitioner's trial counsel

5  after the preliminary hearing and through the trial, where he addresses this issue.  Smith

6  declares that he did not think a motion to exclude testimony would be successful, and that

7  therefore he did not consider consulting with an Alzheimer's expert.  Petitioner's Exhibit 4

8  (hereinafter "Smith Decl.") at ¶ 3.  Smith also states that he believed Margaret was

9  competent to testify, and that her diminished ability to recall events was obvious to the jury.

10  Id.  As a result, he did not consider calling an expert to discredit Margaret's testimony.  Id.

11  Finally, Smith states that petitioner's primary defense at trial was that he did not actually sign

12  the checks, a defense that would not have been bolstered by discrediting Margaret's

13  testimony and her recall ability.  Id.

14    Petitioner cannot demonstrate that the state court's summary dismissal of this claim

15  was objectively unreasonable.  Petitioner is contesting his attorney's trial tactic regarding the

16  Margaret's testimony; a difference of opinion as to trial tactics, however, does not constitute

17  denial of effective assistance, Mayo, 646 F2d at 375.  Tactical decisions are not ineffective

18  assistance simply because in retrospect better tactics are known to have been available.

19  Bashor, 730 F.2d at 1241; Sanders, 21 F.3d at 1456.

20    In this case, Smith's decision was reasonable under the circumstances. To begin with,

21  any expert testimony regarding Margaret's memory would not have bolstered petitioner's

22  defense that he did not actually sign the checks in question.  Moreover, Margaret herself

23  testified at trial:  "Mentally I'm not so good.  My mind is not the same as it was.  I've lost it."

24  Opinion at 2.  Because her diminished ability to recall events was admitted to by her and

25  obvious to the jury, any expert testimony would have been redundant.  Accordingly, there is

26  no reasonable probability that, had petitioner's counsel retained an expert, the result of his

27  trial would have been different.  Strickland, 466 U.S. at 693-694.  Because petitioner cannot

28  demonstrate either deficient performance by his counsel or prejudice as the result of his

1   counsel's actions, this claim must be denied.

2

3          5.       Cumulative Error

4          Petitioner maintains that he is entitled to habeas relief based on the cumulative effect

5   of the alleged state court errors.  In some cases, although no single trial error is sufficiently

6   prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a

7   defendant so much that his conviction must be overturned.  See, e.g., Alcala v. Woodford,

8   334 F.3d 862, 893-895 (9th Cir. 2003) (reversing conviction where multiple constitutional

9   errors hindered defendant's efforts to challenge every important element of proof offered by

10  prosecution).  However, where there is no single constitutional error existing, nothing can

11  accumulate to the level of a constitutional violation.  See Mancuso v. Olivarez, 292 F.3d 939,

12  957 (9th Cir. 2002).

13         Here, petitioner has not demonstrated that there were multiple constitutional errors

14  such that his due process rights were violated.  Petitioner may disagree with the decisions of

15  the state courts, but he has not shown that they were unreasonable under clearly established

16  federal law.  Accordingly, his claim of cumulative error must be denied.

17

18                      **CERTIFICATE OF APPEALABILITY**

19         The federal rules governing habeas cases brought by state prisoners have been

20  amended to require a district court that denies a habeas petition to grant or deny a certificate

21  of appealability ("COA") in its ruling.  See Rule 11(a), Rules Governing § 2254 Cases, 28

22  U.S.C. § 2254 (effective December 1, 2009).  For the reasons set out in the discussion above,

23  petitioner has not shown "that jurists of reason would find it debatable whether the petition

24  states a valid claim of the denial of a constitutional right [or] that jurists of reason would find

25  it debatable whether the district court was correct in its procedural ruling."  Slack v.

26  McDaniel, 529 U.S. 473, 484 (2000).  Accordingly, a COA is DENIED.

27

28

United States District Court

For the Northern District of California

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus and a COA are DENIED.

In addition, all of petitioner's remaining pending requests, including his requests for subpoenas and his requests for, *inter alia*, payment to a doctor specializing in Alzheimer's disease, are without merit and are hereby DENIED WITH PREJUDICE.

DATED: _____October 27, 2010_____

_____
JAMES WARE
United States District Judge

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

JOSE MONTEVERDE,

                    Petitioner,

  v.

SHEILA MITCHELL, Warden,

                    Respondent.

_____/

Case Number: CV09-00407 JW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on _____11/1/2010_____, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Jose Monteverde
1075 Space Park Way
No. 51
Mountain View, Ca 94043

Dated: _____11/1/2010_____

                                      Richard W. Wieking, Clerk
/s/  By: Elizabeth Garcia, Deputy Clerk